# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Walter A.,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>David Easterwood, Director of St. Paul Enforcement and Removal Operations, Immigration and Customs Enforcement; Kristi Noem, Secretary of the Department of Homeland Security; Mike Stasko, Administrator of the Freeborn County Jail; Todd Lyons, Acting Director, U.S. Immigration and Customs Enforcement; Pamela Bondi, Attorney General of the United States; and Joseph Edlow, Director, United States Citizenship and Immigration Services, in their official capacities,<br><br>　　　　　　Respondents. | No. 26-cv-1393 (SRN/LIB)<br><br><br><br>**ORDER** |

Stacey Rogers, SSR Law Group LLC, 600 25th Ave. S., Ste. 201, St. Cloud, MN 56301; Hannah Brown, 1907 E. Wayzata Blvd., Ste. 300, Wayzata, MN 55391, for Petitioner

David W. Fuller and David R. Hackworthy, U.S. Attorney's Office, 300 S. 4th St., Minneapolis, MN 55415, for Respondents

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Petitioner Walter A.'s Petition for Writ of Habeas Corpus ("Petition") [Doc. No. 1], his Emergency Motion to Hold in Contempt and Order Immediate Release Motion for a Temporary Restraining Order ("Contempt Motion") [Doc. No. 16], and his Motion for TRO and Preliminary Injunction ("Deferred Action Rescission

Motion") [Doc. No. 22].  Respondents oppose the Petition, the Contempt Motion, and the Deferred Action Rescission Motion.  (Resp'ts' Am. Resp. to Pet. & Opp'n to Contempt Mot. [Doc. No. 24]; Resp'ts' Opp'n to DA Rescission Mot. [Doc. No. 26].)  The Court held an evidentiary hearing on the Petition and the two motions on February 27 and March 5, 2026.

For the reasons set forth below, the Court grants the Petition in part as to Walter A.'s claims challenging the legality of his detention, denies it in part as to his claims challenging biometrics policies and procedures and his T Visa and U Visa applications, denies as moot the Contempt Motion, and denies the Deferred Action Rescission Motion. The Court orders Petitioner's release from custody.

## I.      BACKGROUND

### A. Petitioner's Immigration to the United States

Walter A., a Guatemalan national, entered the United States without inspection in 2020, when he was approximately 15 years old.  (Pet. ¶ 22.)  He alleges that his childhood was marked by severe neglect, instability, and profound abuse.  (*Id.* ¶ 22.)  His parents failed to protect or care for him in any meaningful way and he suffered significant physical, sexual, and emotional abuse at their hands, or inflicted by others with his parents' acquiescence.  (*Id.*)  In addition, Walter contends that his home life involved violence, intimidation, and deprivation and included the withholding of food and basic necessities and beatings.  (*Id.*)

With no realistic prospect of safety, Walter fled Guatemala at the age of 15, intending to seek asylum in the United States.  (*Id.*)  He alleges that he suffered numerous

hardships on his journey to the United States, including being held in captivity for two months by a cartel in Mexico in exchange for a ransom. (*Id.*) During his captivity, he alleges that his captors subjected him to coercion and psychological trauma as he witnessed violence committed against others. (*Id.*) His captors released him only after a cousin paid for his release. (*Id.*)

Walter alleges that upon entering the United States in March 2020, the same cousin who paid the ransom subjected him to exploitation and coercion. (*Id.* ¶ 23.) He was forced into prolonged labor, isolated from support systems, and had substantial wages withheld under the guise of debt "repayment" that far exceeded any legitimate debt. (*Id.*)

Walter A. further contends that these difficulties contributed to his abuse of alcohol, which, in turn, led to two arrests and one conviction for driving-under-the-influence violations in Minnehaha County, South Dakota. (*Id.* ¶ 24.)

In June 2024, upon Walter A.'s release from the Minnehaha County Jail on one of the DUI offenses, officers with U.S. Immigration and Customs Enforcement ("ICE") detained him and initiated removal proceedings. (*Id.*) He has remained in immigration custody ever since.

Walter A. subsequently pursued multiple forms of administrative relief, including applying for Special Immigrant Juvenile Status ("SIJS"). (*Id.*) To provide context for the facts and legal issues that follow, some understanding of SIJS is necessary.

### B.  Special Immigrant Juvenile Status

SIJS establishes eligibility to apply for a Permanent Resident Card, or "green card," through an adjustment in status application with the goal of obtaining Lawful Permanent Resident ("LPR") status.  8 U.S.C. § 1153(b)(4).

### 1.  Legislative History

Congress created the SIJS classification in 1990 to provide relief for foreign-born children living in the United States who have been abused, neglected, abandoned, or similarly mistreated by a parent and for whom a state court has found it would not be in their best interest to be returned to their country of origin.  *See*  8 U.S.C. § 1101(a)(27)(J); *Yeboah v. U.S. Dep't of Just.*, 345 F.3d 216, 221 (3d Cir. 2003) ("The SIJ provisions of the [Immigration and Nationality Act] were enacted in 1990 to protect abused, neglected, or abandoned children. . . . [S]uch children may seek special status to remain in the United States."); (*see also* Evid. Hr'g Tr. [Doc. Nos. 41 & 46] at 14–18).

From the outset, Congress extended certain protections against deportation to SIJS beneficiaries, stating that specified grounds for deportation "shall not apply to a special immigrant [juvenile] based upon circumstances that exist before the date the alien was provided such special immigrant status."  IMMACT, Pub. L. No. 101-649, sec. 153(b), 104 Stat. at 5006 (codified at 8 U.S.C. § 1227(c)).  Under this provision, while Special Immigrant Juveniles can be deported on certain grounds such as serious criminal convictions or threats they might pose to national security, they are not subject to deportation on other more typical grounds, such as having entered the country without

inspection. (*Id.*) Thus, Congress exempted Special Immigrant Juveniles from deportability based on entry without inspection. (*Id.*)

While the 1990 Act prevented the physical removal of Special Immigrant Juveniles on specified grounds, the legislation did not enable them to adjust legal status to obtain a green card. (Scholtz Report [Doc. No. 31-1] ¶ 31.) Thus, in the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 ("MTINA"), Congress amended the SIJS statute in three ways to reduce and eliminate barriers for Special Immigrant Juveniles to obtain a green card. (Evid. Hr'g Tr. at 45.) First, and most importantly, because adjustment of status is generally only available to a person "who was inspected and admitted or paroled into the United States," 8 U.S.C. § 1255(a), Congress provided that Special Immigrant Juveniles "shall be deemed, for purposes of [adjustment of status] to have been paroled into the United States" at the time of entry into the country. *Id.* § 1255(h)(1). Second, the MTINA removed certain barriers for SIJS applicants that might otherwise hinder immigrants in adjusting their status, such as requirements that the noncitizen has never worked unlawfully and has maintained lawful continuous presence in the United States. (Evid. Hr'g Tr. at 46; Scholtz Report ¶ 33 (citing Pub. L. No. 102-232, sec. 302(d)(2)(B), 105 Stat. at 1744-45).) Third, the MTINA exempted Special Immigrant Juveniles from certain grounds of inadmissibility that might otherwise apply to them, such as demonstrating that they would not become a public charge. 8 U.S.C. § 1255(h)(2); (*see also* Evid. Hr'g Tr. at 46–47).

In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Congress corrected potential problems for SIJS beneficiaries that

unintentionally flowed from the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") of 1996.  (Scholtz Report ¶¶ 35–38.)  Specifically, in a section of the TVPRA titled "Permanent Protection for Certain At-Risk Children," Pub. L. No. 110-457, sec. 235(d), 122 Stat. at 5079, Congress exempted SIJS beneficiaries from inadmissibility based on having entered the United States without admission or parole or at an unauthorized time or place, allowing SIJS beneficiaries once again to adjust status despite having entered the country without undergoing inspection.  (Scholtz Report ¶ 38.)

Certain grounds of inadmissibility remain in place, however, such as crime-based inadmissibility for crimes involving moral turpitude or controlled substance violations.  8 U.S.C. § 1182(a)(2)(A).

SIJS also confers affirmative benefits on beneficiaries, such as access to federally funded education and preferential status for employment-based green cards.  8 U.S.C. § 1232(d)(4)(A), 1153(b).

### 2.  SIJS Application, Approval, and Revocation Procedures

To be eligible for SIJS, an applicant must be (1) under 21 years old[1]; (2) unmarried; and (3) present in the United States.  8 C.F.R. § 204.11(b).  Because of the requirement that SIJS applicants be present in the United States, they cannot seek SIJS through consular processing from outside the country.  (Evid. Hr'g Tr. at 61.)

---

[1] If the applicant was under 21 at the time the application was filed, the applicant retains SIJS as they age.  8 U.S.C. § 1232(d)(6); (Evid. Hr'g Tr. at 61–62).

In addition, an applicant must obtain an order from a state juvenile court finding that:

(a) The applicant is dependent on the court or placed in the custody of, or legally committed to, a state agency or individual appointed by the court;

(b) The applicant cannot be reunified with one or both parents due to abuse, neglect, abandonment, or a similar basis found under state law; and

(c) It is not in the applicant's best interest to return to his country of nationality or last habitual residence.

8 U.S.C. § 1101(a)(27)(J)(i)–(ii); 8 C.F.R. § 204.11(c)(1)–(2). The state juvenile court findings must be "in accordance with state law governing such declarations of dependency." 8 C.F.R. § 204.11(c)(3).

In September 2024, Walter A. petitioned the state court in Scott County, Minnesota for the appointment of his older brother as his legal guardian. (*See* Order for Guardianship of At-Risk Juvenile (Scott Cnty. Dist. Ct. Oct. 2, 2024) [Doc. No. 1-3 at 29].) The Scott County District Court specifically found, consistent with Minn. Stat. § 257D.03(2), that: (1) Walter A. was an at-risk juvenile whose guardianship with his parents was not viable due to their abandonment, abuse, and neglect; (2) it was not in Walter A.'s best interest to be returned to his parents in Guatemala; and (3) it was in Walter A.'s best interest to appoint his brother as his guardian "and that [Walter A.] remain[] in the United States with Proposed Guardian." (*Id.* at 3.)

After obtaining a state juvenile court's protection, SIJS applicants then file an application with U.S. Citizenship and Immigration Services ("USCIS"), which exercises delegated authority from the Secretary of the Department of Homeland Security ("DHS")

to grant or deny an SIJS application.  (Scholtz Report ¶ 43.)  USCIS must ensure that "the request for SIJ classification [is] bona fide," i.e., "the petitioner has established that 'a primary reason' for his appearance in juvenile court was 'to obtain relief from parental abuse, neglect, abandonment,' or something similar."   (*Id.*) (citing 8 C.F.R. § 204.11(b)(5)).  Because the statutory scheme requires "the approval of both state and federal authorities," it effectively "establish[es] a successful applicant as a ward of the United States."  *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 168 (3d Cir. 2018).

Once the SIJS application is granted, the Special Immigrant Juvenile is "deemed, for purposes of subsection (a) [adjustment of status], *to have been paroled* into the United States."  8 U.S.C. § 1255(h)(1) (emphasis added); *see also* 8 C.F.R. § 1245.1(a) ("A special immigrant [juvenile] . . . shall be deemed, for the purpose of applying the adjustment to status provisions of section 245(a) of the Act, *to have been paroled into the United States, regardless of the actual method of entry into the United States*.") (emphasis added).  Again, § 1255(h) further exempts from inadmissibility Special Immigrant Juveniles who, like Petitioner, were charged with being present in the United States without admission or parole.  8 U.S.C. § 1255(h)(2)(A) (waiving 8 U.S.C. § 1182(a)(6)(A)); (Evid. Hr'g Tr. at 62).

Given the "host of important benefits" that SIJS confers on beneficiaries, *Osorio-Martinez*, 893 F.3d at 163, in order for the government to revoke this special status, Special Immigrant Juveniles are entitled to due process, by statute and regulation.  8 U.S.C. § 1155; 8 C.F.R. § 205.2(a).  USCIS may revoke SIJS only on a showing of "good and sufficient cause."  8 U.S.C. § 1155; 8 C.F.R. § 205.2(a).  Except in rare circumstances, revocation

8

may proceed "only on notice to the petitioner," who "must be given the opportunity to offer evidence in support of the petition . . . and in opposition to the grounds alleged for revocation. . . ."   8 C.F.R. §§ 205.2(b), 204.11(j).   USCIS must provide a written explanation for any revocation of SIJS.  *Id.* § 205.2(c).

### 3.  SIJS Adjustment of Status and Deferred Action

While SIJS establishes eligibility to apply for a green card through an adjustment in status application, 8 U.S.C. § 1153(b)(4), an SIJS recipient can only apply for adjustment of status if an immigrant visa is immediately available at the time of filing.  *Id.* § 1255(a). The relevant visa category for SIJS recipients is the employment-based fourth preference special immigrant category visa, known as the EB-4 visa.  *Id.* § 1153(b)(4); (*see also* Evid. Hr'g Tr. at 83–84).  If no EB-4 visas are available at the time a person receives SIJS approval, they cannot apply for adjustment of status at that time.  Calli Schmitt, *The Various Problems and Instabilities with the Implementation of the Special Immigrant Juvenile Status Statute*, 29 Cardozo J. Equal Rts. & Soc. Just. 223, 232 (2022).  Like other green card applicants in the EB-4 visa category, SIJS recipients are subject to limitations on the number of green cards that may be issued based on their country of origin.  *Id.* "If the juvenile is coming from a retrogressed country—a country that exceeds its statutory limit of seven percent per-country—the juvenile is unable to adjust their status unless the Visa Bulletin is current."  *Id.*  In recent years, there was a particularly high demand for visas from SIJS recipients originally from Guatemala, El Salvador, Honduras, and Mexico, creating a backlog.  *Id.*

In 2022, due to the backlog in EB-4 visas, USCIS announced a deferred action program for persons with SIJS ("SIJS-DA Program"). (Scholtz Report, Ex. C (USCIS, Policy Alert PA-2-22-10, Special Immigrant Juvenile Classification and Deferred Action (Mar. 7, 2022) ("2022 SIJS-DA Policy Alert")).) Deferred action is "a form of enforcement discretion not to pursue the removal of certain aliens for a limited period in the interest of ordering enforcement priorities in light of limitations of available resources, taking into account humanitarian considerations and administrative convenience." 8 C.F.R. § 236.21(c). The grant of deferred action also allows noncitizens to apply for employment authorization. *See id.* § 274a.12(c).

Under the 2022 SIJS-DA Program, USCIS automatically considered SIJS beneficiaries for four-year periods of deferred action, and permitted those with deferred action to apply for work authorization pursuant to 8 C.F.R. § 274a.12(c)(14). (*See* SIJS-DA Approval Notice [Doc. No. 1-3 at 13]) ("Your grant of deferred action will remain in effect for a period of four years from the date of this notice [2/11/2025] unless terminated earlier by USCIS."). Prior to the SIJS-DA Program, USCIS adjudicators could consider deferred action for SIJS beneficiaries on a case-by-case basis, but such consideration was not automatic. (2022 SIJS-DA Policy Alert at 1; Evid. Hr'g Tr. at 162.) Explaining the new policy, USCIS stated, "Due to ongoing visa number unavailability, the protection that Congress intended to afford SIJs through adjustment of status is often delayed for years, leaving this especially vulnerable population in limbo." (2022 SIJS-DA Policy Alert at 1.) The agency further explained,

10

> Deferred action and related employment authorization will help to protect SIJs who cannot apply for adjustment of status solely because they are waiting for a visa number to become available. This process furthers congressional intent to provide humanitarian protection for abused, neglected, or abandoned noncitizen children for whom a juvenile court has determined that it is in their best interest to remain in the United States.

(*Id.*)

Moreover, USCIS expressed its belief that approved SIJS petitioners "have a reliance interest in being provided with employment authorization consistent with the congressional intent in creating the SIJ program to protect vulnerable children by providing them with a pathway to LPR status, without having to wait years for a visa." (*Id.* at 3.) As additional background for the SIJS-DA Program, USCIS observed that

> SIJs are unlikely to be enforcement priorities as evidenced by the broad waivers of inadmissibility Congress established [in 8 C.F.R. § 245.1(e)(3)], as well as ICE Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims, which states that absent exceptional circumstances, ICE defers enforcement actions against SIJs until they adjust status to that of an LPR.

(*Id.* at 2–3.)

The USCIS Policy Manual thus advised SIJS adjudicators to treat SIJS approval as a "particularly strong positive factor that weighs heavily in favor of granting deferred action," noting that "the eligibility criteria for SIJ classification are generally strong positive factors in such a determination, including that a juvenile court determined that it was in the best interest of the SIJ not to be returned to the country of nationality . . . ."

(Scholtz Report, Ex. D (USCIS Policy Manual Vol. 6, Pt. J, Ch. 4G(2) (archived Apr. 18, 2025).)[2]

### C. USCIS Determinations and Immigration Court Proceedings Prior to the Instant Habeas Action

On February 11, 2025, USCIS approved Walter A.'s SIJS application with deferred action for four years.  (SIJS-DA Approval Notice [Doc. No. 1-3 at 13].)  By doing so, USCIS found that Walter A.'s request for SIJ classification was bona fide, i.e., he had "establish[ed] that a primary reason the required juvenile court determinations were sought was to obtain relief from parental abuse, neglect, abandonment, or a similar basis under State law."  8 C.F.R. § 204.11(b)(5).  Thus, as a Special Immigrant Juvenile, USCIS "deemed [Walter], for purposes of [adjustment of status], to have been paroled into the United States."  8 U.S.C. § 1255(h)(1).  Given the high demand for visas in the EB-4 category from Guatemalan applicants, Walter will be eligible to apply for adjustment of status in approximately three years.  (Scholtz Report ¶ 27.)

In addition to obtaining SIJS with deferred action, Walter A. also has pending applications with USCIS for a T Visa, U Visa, and asylum.  (Pet. ¶ 25.)

---

[2] In April 2025, USCIS stopped considering deferred action when approving SIJS applications, and in June 2025, formally announced that it was rescinding the SIJS-DA Program. (Scholtz Report, Ex. E (USCIS, Policy Alert PA-2025-07, Special Immigrant Juvenile Classification and Deferred Action (June 6, 2025) ("2025 Recission Policy"); Evid. Hr'g Tr. at 177–78.)  In an ongoing class action, the U.S. District Court for the Eastern District of New York has temporarily stayed the rescission of the SIJS-DA Program, finding USCIS's recission likely violates the Administrative Procedure Act and federal regulations.  *A.C.R. v. Noem*, 809 F. Supp. 3d 103, 129 (E.D.N.Y. 2025).  The docket in *A.C.R.* indicates that USCIS is "revisiting" its rescission of the SIJS-DA Program. *A.C.R.*, No. 25-cv-3962 [Doc. No. 78] & Feb. 10, 2026 Order.

Walter A.'s Notice to Appear for removal proceedings[3] identifies one ground of inadmissibility: being present in the United States without admission or parole under 8 U.S.C. § 1182(a)(6)(A)(i). (*See* Evid. Hr'g Tr. at 62.) It does not charge inadmissibility for acts of criminality under § 1182(a)(2), (*id.*), nor could it, as his DUI conviction is not a crime of moral turpitude nor is it a controlled substance offense, nor was he convicted of two or more offenses resulting in an aggregate sentence of confinement for five years or more, as required for inadmissibility under 8 U.S.C. § 1182(a)(2)(A)-(B). (*See* Evid. Hr'g Tr. at 64–65.)

Walter A. further contends that although an Immigration Judge initially terminated removal proceedings based on his SIJS and deferred action, the Board of Immigration Appeals ("BIA") reversed due to a factual error. (Pet. ¶ 25.) Walter A. has contested his detention and removal proceedings with USCIS and has litigated in Immigration Court and the BIA. (*See* Robinson Decl. [Doc. No. 12] ¶¶ 10–44.) On October 14, 2025, an Immigration Judge issued an oral order denying Walter A.'s application for asylum and withholding of removal, and ordered that he be removed to Guatemala. (*Id.*¶ 29.) The removal order became administratively final on November 13, 2025. (*Id.*)

On December 1, 2025, an Immigration Judge denied Walter A.'s motion to reopen and his emergency motion to stay removal. (*Id.* ¶ 38.) On December 3, 2025, he filed an

---

[3] A Notice to Appear is a charging document that initiates removal proceedings and specifies the charges against the noncitizen whom DHS seeks to remove from the United States. USCIS, Policy Mem. PM-602-0187, Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_ FINAL_ 2.28.25_FINAL.pdf (last accessed Mar. 23, 2026).

appeal with the BIA, (*id.* ¶ 39), and on December 10, 2025, he filed an emergency motion to stay removal with the BIA. (*Id.* ¶ 41.) It appears that both of those matters are pending.

Walter A. remains in ICE detention at the Freeborn County Jail in Albert Lea, Minnesota. (*Id.* ¶ 47.)

### D. Prior Habeas Actions

This is Walter A.'s fourth habeas action in this Court. His first action, *Walter A. v. Berg*, 25-cv-1915 (PAM/LIB) ("*Walter A. I*"), was filed in April 2025, prior to the entry of the removal order in Immigration Court. His second habeas action, *Walter A. v. Berg*, 25-cv-4376 (PJS/DLM) ("*Walter A. II*"), was filed in November 2025, shortly after the Immigration Court entered the final order of removal. Both petitions were dismissed without prejudice, without ruling on the merits. In *Walter A. II*, Chief Judge Schiltz held that under *Zadvydas v. Davis*, 533 U.S. 678 (2001), Walter A. was still within the 90-day mandatory detention period under 8 U.S.C. § 1231(a)(2), and could not obtain relief at this time. (*Walter A. II* [Doc. Nos. 10, 15, 17].) However, for purposes of permitting Walter A. to pursue a colorable *Zadvydas* claim by filing a new habeas action in the near future, Chief Judge Schiltz temporarily enjoined the government from removing Walter A. from the United States. (*Id.* [Doc. No. 17]. )

In December 2025, Walter A. filed his third habeas action, *Walter A. v. Berg*, 25-cv-4720 (SRN/LIB) ("*Walter A. III*"). He requested release from detention, arguing that he was not subject to removal in the foreseeable future due to his grant of SIJS and deferred action. (*Walter A. III.* [Doc. No. 1].) At the time, ICE detained Walter A. at an ICE facility in Texas. (*Id.* [Doc. No. 1 at 17].) Respondents argued that the Court lacked jurisdiction

14

over the matter and, on December 22, 2026, sought dismissal or transfer of venue on that basis. (*Id.* [Doc. No. 9].) However, while Respondents' Motion to Dismiss or Transfer Venue was pending, ICE voluntarily returned Walter A. to Minnesota on December 26, 2026. (*See id.* [Doc. Nos. 20, 22, 23, 30].) Walter A. then sought leave to file an amended petition to reflect the correct physical custodian as one of the Respondents because he was no longer in Texas. (*Id.* [Doc. Nos. 22–24].) Respondents objected, but conceded that Petitioner could simply file an entirely new habeas action to rectify the problem, rather than seek to amend the existing petition. (*Id.* [Doc. No. 25 at 12].)

### E.  Current Habeas Action

On February 12, 2026, Walter A. filed his fourth habeas action—the instant matter, *Cruz v. Easterwood*, 26-cv-1393 (SRN/LIB),—ostensibly to cure any remaining issues with jurisdiction and venue. In light of the new action, the Court denied the petition in Walter A.'s third habeas action without prejudice. (*Walter A. III* [Doc. No. 30].) In the instant action, the Court issued an order that temporarily precludes Respondents, "along with their officers, agents, and all others acting in concert with them," from removing, transferring, or facilitating the removal of Walter A. from the District of Minnesota pending resolution of this matter. (Feb. 12, 2026 Text-Only Order [Doc. No. 4].)

Walter A.'s habeas claims fall into three categories. First, he alleges that his continued detention violates the INA, federal regulations, and the Fifth Amendment, for which he seeks immediate release. (Pet., Counts I–III.) Second, he alleges that Respondents' actions with respect to biometrics policies violate federal statutes and the Fifth Amendment. (*Id.*, Counts IV–VII.) Third, he alleges that Respondents' refusal to

15

expedite his pending T Visa and U Visa applications violate administrative policies and statutory authority. (*Id.*, Count VIII.)

### 1. Biometrics Appointment

Contemporaneously with the filing of his Petition in this action, Walter A. also filed an initial Emergency Motion for a Preliminary Injunction ("Biometrics Motion"). In his Biometrics Motion, Walter A. sought immediate release in order to attend a February 17, 2026 biometrics appointment related to his U Visa application. (Pet'r's Biometrics Mot. [Doc. No. 5] at 11.) He asserted that missing the appointment could jeopardize his pending U Visa application. (Pet'r's Biometrics Reply [Doc. No. 13] at 20–25.) As a general matter, Walter A. argued that release was warranted because he was likely to prevail on his claim that his continued detention violates 8 U.S.C. § 1231(a)(6) and *Zadvydas*. (*Id.*) By this time, his initial 90-day period of mandatory detention had expired, and he asserted that he was eligible for release because his removal was no longer reasonably foreseeable due to his approved SIJS petition and his grant of deferred action, in effect for four years. (*Id.* at 5.)

Respondents argued that Walter A.'s continued detention was lawful under *Zadvydas* because there was a significant likelihood of his removal in the reasonably foreseeable future. (Resp'ts' Initial Response to Pet. [Doc. No. 11] at 9–14.) Respondents referred to Walter A.'s "pending SIJS application" and deferred action (although he had obtained SIJS for over a year at that point), arguing that deferred action was merely an exercise of prosecutorial discretion that did not impede DHS's ability to detain and remove him. (*Id.* at 14–16.) In addition, Respondents disputed the necessity of Walter A.'s

16

attendance at the biometrics appointment, stating that he could still apply for and receive a U Visa even if he were removed from the United States. (*Id.* at 16.) However, Respondents offered that "[i]f the Court is inclined to grant any relief, then such temporary relief should be to facilitate a biometrics appointment, not release from custody." (*Id.*)

In the Court's February 16, 2026 Order on Petitioner's Biometrics Motion, the Court accepted Respondents' invitation to facilitate Walter A.'s attendance at his February 17, 2026 biometrics appointment. (Feb. 16, 2026 Order [Doc. No. 14] at 6–10.) Accordingly, the Court ordered Respondents to transport Walter A. to and from the biometrics appointment, return him to the Freeborn County Jail after the appointment, and confirm their compliance with this Order within 48 hours of the appointment. (*Id.* at 10.) The Court denied without prejudice Walter A.'s other requested relief. (*Id.* at 9.)

The Court also noted that Walter A.'s underlying Petition "presents complicated questions concerning jurisdiction and the effect of SIJS on the *Zadvydas* analysis—specifically whether Walter A.'s SIJS makes his removal not reasonably foreseeable and renders his continued detention unlawful." (*Id.* at 7.) Because of disputed issues of fact relevant to the Petition, the Court found that an evidentiary hearing would be necessary and scheduled the hearing for March 10. (*Id.* at 7, 9.) The Court required the parties to present evidence through witnesses and exhibits, ordered the appearance and testimony of a knowledgeable USCIS officer, and required further briefing. (*Id.* at 7–8.)

### 2. Contempt Motion

On February 18, 2026, Petitioner filed his Contempt Motion, along with the Affidavit of Walter A. [Doc. No. 16-1] and an additional exhibit [Doc. No. 16-2]. Walter

A. attested that on February 17, 2026, officers transported him to the USCIS Application Support Center in St. Paul, Minnesota for his biometrics appointment. (Walter A. Aff. ¶ 3.) However, upon arrival, a USCIS officer responded that "USCIS does not conduct biometrics for detainees," and a USCIS supervisor confirmed the policy. (*Id.* ¶¶ 7, 11.) ICE officers then transported Walter A. back to the Freeborn County Jail. (*Id.* ¶ 11.) Walter A.'s counsel stated that she attempted to reschedule the biometrics appointment, but was unable to do so after the appointment had lapsed. (Pet'r's Contempt Mot. at 2.)

Walter A. requested an order to show cause as to why Respondents should not be held in contempt of court for refusing to proceed with his biometrics appointment, as ordered by the Court, and an evidentiary hearing at which the relevant USCIS officers and supervisors would be required to answer questions, under oath, relating to their conduct. (*Id.* 4.) Walter A. also renewed his request for immediate release from custody. (*Id.* at 3.)

In a February 18, 2026 Order, the Court ordered Respondents to show cause why Petitioner's Contempt Motion should not be granted. (Feb. 18, 2026 Order [Doc. No. 21] at 4–5.) The Court directed the parties to file legal memoranda and exhibits, and rescheduled the evidentiary hearing to an earlier date, February 27, 2026. (*Id.*) The Court further ordered Respondents to make certain disclosures regarding their witnesses and the USCIS policy on which it relied in refusing to provide Walter A. with a biometrics exam, to identify a legal and constitutional basis for refusing the exam to all detainees, and to be fully prepared to argue why SIJS does not make Walter A.'s removal unlikely in the reasonably foreseeable future. (*Id.*)

In written responses, Respondents asserted that on February 19, 2026, ICE Enforcement and Removal Operations ("ERO") took Walter A.'s biometric fingerprints and sent them to a USCIS Services Center for processing. (Resp'ts' Am. Resp. to Pet. & Opp'n to Contempt Mot. at 2; Warren Decl. [Doc. No. 30] ¶ 7].) Matthew Warren, Section Chief for the Service Center Operations Directorate at USCIS, stated in a declaration that USCIS received Walter A.'s fingerprints the following day, and that the agency would "employ its normal processes and procedures to review the fingerprints and consider them, and [conduct] background checks based upon them, in the adjudication of Petitioner's filings." (Warren Decl. ¶¶ 8–9.) In light of Section Chief Warren's Declaration, Respondents requested that the Court cancel the portion of the February 27, 2026 evidentiary hearing regarding Walter A.'s Contempt Motion. (Resp'ts' Feb. 24, 2026 Letter [Doc. No. 29] at 1.)

### 3. Termination of Deferred Action

The day after the Court issued its Show Cause Order on the Contempt Motion, February 19, 2026, Walter A. received notification of termination of his deferred action. (Pet'r's DA Rescission Mot., Ex. A (Notice of DA Term. [Doc. No. 23].) On February 20, 2026, he filed the instant Deferred Action Rescission Motion in which he seeks injunctive relief. He argues that the timing of the termination of his deferred action, coupled with the lack of any changes in his circumstances, demonstrates that Respondents' actions were retaliatory and unlawful. (Pet'r's DA Rescission Mot. at 1.) Walter A. requests that the Court invalidate the termination of his deferred action and require Respondents to provide

19

a lawful basis for any future revocation that satisfies the First and Fifth Amendments of the Constitution. (*Id.* at 12.)

In response to the Deferred Action Rescission Motion, and the Petition, Respondents argue that Petitioner's Motion should be denied as moot, as it is no longer possible for the Court to provide Walter A. with his requested relief "because USCIS has already terminated his deferred action." (Resp'ts' Response to DA Rescission Mot. [Doc. No. 26] at 2–3.) In addition, they contend that USCIS has sole prosecutorial discretion for terminating deferred action for persons with SIJS. (*Id.* at 1, 3–5.) Respondents assert that Petitioner cannot point to any regulation or law that prevents USCIS from exercising such discretion because the deferred action that it previously conferred on Walter A. "result[ed] from nothing more than a policy guidance." (*Id.* at 4.) As to Walter A.'s claim of retaliation, Respondents argue that the only factual evidence on which Petitioner relies is temporal proximity, but that "Petitioner ignores [that] the final removal order . . . occurred after the grant of deferred action." (*Id.*)

### 4. Evidentiary Hearing

The Court initially held the evidentiary hearing on Walter A.'s Petition and the two pending motions on February 27, 2026. (Feb. 18, 2026 Order at 5.)

#### a. Witness Disclosures

In advance of the hearing, the Court directed Respondents to identify and produce as witnesses: (1) the USCIS supervisor who refused to conduct Walter A.'s biometrics appointment; (2) a USCIS officer who was fully knowledgeable about Walter A.'s SIJS and SIJS in general; and (3) either that officer or another USCIS officer should be prepared

to testify about why, and the authority under which USCIS violated an order of this Court to conduct Walter A.'s biometrics appointment, the written policy relied upon by USCIS in refusing to provide Walter A. with a biometrics exam, and, in particular, whether USCIS refuses such exams (and hence the U Visa status) for all detainees. (*Id.*) The Court ordered both parties to identify their witnesses and exchange witness lists no later than February 24, 2026. (*Id.*)

On February 24, Petitioner filed an expert witness disclosure and expert report, identifying Rebecca Scholtz, Esq., Staff Attorney at the National Immigration Project, as an expert witness on SIJS and its legislative history. (Pet'r's Witness Disclosure [Doc. No. 31] at 1; Scholtz Report ¶ 5.)

Respondents failed to file a witness disclosure as required by February 24. Instead, on that date, they filed a "Status Report," attaching Section Chief Warren's Declaration, discussed earlier, in which Warren attested that ICE officers had manually fingerprinted Walter A. and submitted his fingerprints to USCIS in support of his T Visa and U Visa applications.

Two days later, on the eve of the evidentiary hearing, at 9:16 p.m. on February 26, Respondents untimely filed their witness list, identifying three witnesses: (1) DHS/ERO Deportation Officer William Robinson, who was expected to testify "regarding the facts of this case relating to Petitioner's significant likelihood of removal in the foreseeable future"; (2) DHS-USCIS Assistant Center Director Jerome Johnson, who was expected to testify regarding his knowledge of USCIS's policies and procedures on SIJS and deferred action, as well as his knowledge of the termination of Petitioner's deferred action, including the

21

process and reasons for the same; and (3) Vicki Gonzalez, Contractor and Site Supervisor at the USCIS Application Support Center, who was expected to testify regarding the facts and circumstances of Petitioner's biometrics appointment, as well as the written USCIS policies she applied in refusing to conduct Walter A.'s appointment.  (Resp'ts' Witness List [Doc. No. 34]; Resp'ts' Am. Witness List [Doc. No. 39].)

Later that night, at 10:13 p.m., Respondents filed an Objection to Petitioner's proposed expert witness.  They argued that Ms. Scholtz was "no more an expert on the law than any other attorney," that it was unclear what scientific, technical or specialized knowledge she possesse[d]" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, and that her opinion could not be relied upon "based on her professional background working for organizations with a clear bias: advocating and advancing the rights of unlawful immigrants against Federal Respondents' enforcement of immigration laws."  (Resp'ts' Obj. [Doc. No. 35] at 1.)  In particular, Respondents noted Ms. Scholtz's role as part of plaintiffs' class counsel in *A.C.R. v. Noem*, No. 25-cv-3962 (E.D.N.Y. 2025), which challenges the government's termination of the SIJS-DA Program.  (*See* Evid. Hr'g Tr. at 25.)  Respondents further argued that Ms. Scholtz's Report gives an impermissible legal conclusion, a determination that is reserved solely for the Court.  (Resp'ts' Obj. at 2) (citing *Thomas v. Braze*, 57 F. Supp. 3d 1040 (D. Minn. 2014) (concluding that expert gave improper opinion regarding "legal conclusion," and noting that "[l]egal conclusions are distinct from industry practices and standards, which are generally admissible.")).

### b. Rulings re: Witnesses

### (1) Petitioner's Expert Witness

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," the testimony "is based on sufficient facts or data," is "the product of reliable principles and methods" and the expert "has reliably applied the principles and methods to the facts of the case."

At the evidentiary hearing on February 27, 2026, the Court found that pending direct examination to qualify Ms. Scholtz as an expert witness, her expertise with regard to SIJS would be helpful to the Court. (Evid. Hr'g Tr. at 26.) The Court also observed that the requirements for admissibility of expert testimony under Rule 702 and *Daubert* are viewed liberally in favor of admissibility. (*Id.*); *see In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019) (noting that "under *Daubert*, liberal admission" of expert testimony "is prevalent," and "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.").

The Court overruled Respondents' objection to the admissibility of Ms. Scholtz's opinion based on her role in *A.C.R. v. Noem*, noting that the case challenges USCIS's June 6, 2025 change in policy regarding the SIJS-DA Program. (Evid. Hr'g Tr. at 25–26; *see A.C.R. v. Noem*, 809 F. Supp. 3d 103, 111–13 (E.D.N.Y. 2025). The Court found that because Walter A. obtained deferred action prior to the June 6, 2025 policy change, neither

*A.C.R.*, nor Ms. Scholtz's advocacy role in that case, are applicable to Walter A. (Evid. Hr'g Tr. at 26.)

As to Respondents' more general objections to Ms. Scholtz's testimony based on her alleged "bias" as a practitioner who has represented immigrant children and performed immigration defense work, the Court found these objections related to credibility, not admissibility, and noted that Respondents' counsel would have a full opportunity to conduct voir dire of Ms. Scholtz and cross-examine her. (*Id.* at 36–42, 76–90.)

As to Respondents' objection to Ms. Scholtz offering any legal opinions, the Court overruled it in part and sustained it in part. (*Id.*) The Court held that Ms. Scholtz may not offer any legal opinions as to decisions the Court must make in this case. (*Id.*) Indeed, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers*, *Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438-39 (8th Cir. 1995)). Still, expert testimony that bears on facts that support a legal conclusion may be admissible. As one court put it:

> In distinguishing admissible testimony from inadmissible [legal] testimony, the task for the Court is to ask whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions that are urged. In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.

*Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 238 (S.D. Iowa 2010) (*citing Woodard v. Andrus*, No. 03-2098, 2009 WL 140527, at *1 (W.D. La. Jan. 20, 2009)) (internal quotation marks omitted). Whether a legal standard has been met is for the Court—and the

Court alone—to decide, not an expert. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (excluding expert testimony on whether officer conduct was reasonable under Fourth Amendment standards).

In *David v. Signal International, LLC*, No. 08-1220, 2015 WL 14018914, at *2 (E.D. La. Jan. 11, 2015), the court generally admitted the expert testimony of two qualified immigration experts who, like Ms. Scholtz, were attorneys. As a general matter, the court found that their testimony would be helpful to the trier of fact "[b]ecause immigration law is a large and complex body of law." *Id.* In particular, the court permitted the immigration experts to testify about factual issues dealing with immigration law and the general process for obtaining visas and green cards. *Id.* The court also found admissible "testimony regarding the language and applicability of immigration statutes and regulations and whether conduct generally would be consistent or inconsistent with these laws" because it did not constitute a legal conclusion and would be helpful to the trier of fact. *Id.* However, the court found that a portion of an expert's opinion that characterized a defendant's conduct as "deceptive," was inappropriate and excludable because it offered a legal conclusion about whether the defendant's actions were fraudulent or involved misrepresentations. *Id.*

Consistent with this authority, the Court provisionally admitted Ms. Scholtz's testimony, subject to foundation qualifying her as an expert witness, and precluded her from offering any legal conclusions that are solely within the province of the Court on the issues that the Court must decide in this case. (Evid. Hr'g Tr. at 26.) While the overwhelming majority of Ms. Scholtz's Report addresses the general statutory, regulatory,

25

and administrative framework of SIJS—all of which is helpful to the Court and is admissible—Ms. Scholtz's opinion as to the lawfulness of Walter A.'s detention or removal was and is excluded, as this question is for the Court alone to resolve. (Scholtz Report ¶ 61) (concluding that the law prevents the Government from removing Walter A., and, because there is no reasonable prospect of removal, his continued detention violates the Constitution).

### (2) Respondents' Fact Witnesses

The Court proceeded with the evidentiary hearing on February 27, 2026 as to the direct and cross examination of Ms. Scholtz. (*See* Feb. 27, 2026 Minutes [Doc. No. 36].) To cure Respondents' untimely disclosure of their witnesses, the Court temporarily adjourned the hearing at the conclusion of the direct examination of Deportation Officer William Robinson to allow Petitioner's counsel time to prepare for cross-examining Respondents' three witnesses. The evidentiary hearing resumed on March 5, 2026 with Petitioner's cross-examination of Officer Robinson, and the direct and cross-examinations of Respondents' witnesses Vicki Gonzalez, Supervisor-USCIS Application Support Center, and Jerome Johnson, USCIS. (*See* Mar. 5, 2026 Minutes [Doc. No. 44].)

### c.  Evidentiary Hearing Witness Testimony

### (1) Ms. Scholtz

Ms. Scholtz is a Senior Staff Attorney at the National Immigration Project in Minneapolis, Minnesota, where she trains legal representatives on immigration removal defense and related topics, focusing on SIJS and unaccompanied children. (Scholtz C.V. [Doc. No. 31-1] at 1.) Previously, she performed similar training at the Catholic Legal

26

Immigration Network, Inc., and at Mid-Minnesota Legal Aid. (*Id.*)  In addition, she has served as co-counsel for plaintiffs in several immigration lawsuits. (*Id.*)  While working at Mid-Minnesota Legal Aid, she represented many children seeking SIJS or who had obtained SIJS, and she founded a working group called the SIJS Roundtable that addresses issues related to representation of immigrant children (*Id.*; Evid. Hr'g Tr. at 30–31.)  Ms. Scholtz also serves as a faculty fellow at the University of St. Thomas School of Law, where she provides support for the school's immigration clinic, and she previously served in a similar role as an adjunct associate professor at the University of Minnesota Law School. (Scholtz C.V. at 1.)  Ms. Scholtz has been a frequent presenter at national and regional conferences on topics relating to children's immigration issues and removal defense, and she is the co-author of numerous practice advisories on immigration law topics. (*Id.* at 2.)  She is a 2011 graduate of Yale Law School, where she served as editor of the Yale Law Journal, and represented clients in the school's immigration clinic. (*Id.*; Evid. Hr'g Tr. at 31.)

In preparation for rendering her expert opinion in this case, Ms. Scholtz reviewed numerous documents including the findings and order in Walter A.'s underlying state court juvenile case, USCIS's approval notice that granted Walter A. SIJS and deferred action, USCIS's recent notice of termination of deferred action, certain Immigration Court records, and various filings in this case. (Evid. Hr'g Tr. at 34.)  As to the technical methods or principles she used to formulate her opinion, Ms. Scholtz examined the SIJS legislation, the legislative history, changes to the legislation and current law, as well as the regulatory history of SIJS, and considered and analyzed the facts in this case. (*Id.* at 35.)  The Court

27

found Ms. Scholtz was qualified to testify as an expert witness, and permitted her to testify, subject to the excluded grounds of testimony noted above.[4]  (*Id.* at 42.)

Ms. Scholtz testified as to the history of SIJ protections under the law, the requirements for and process of obtaining SIJS, the effect of SIJS on adjustment of status, the procedural process for revocation of SIJS, and the 2022 SIJS/DA Program and its termination in 2025.  (*Id.* at 43–90.)

### (2) Deportation Officer William Robinson

Respondents offered the testimony of ICE Deportation Officer William Robinson, who works in removal operations, regarding the procedures ICE uses to remove noncitizens from the United States.   (Evid. Hr'g Tr. at 102–09.)  He testified that after a person is subject to a final order of removal, Officer Robinson ensures there are no impediments to removal before obtaining travel documents.  (*Id.* at 103.)  He gave two examples of impediments to removal:  stays of removal or deferrals of removal under the Convention Against Torture ("DCAT").  (*Id.*  at 104.)  As to SIJS, Officer Robinson testified that if a noncitizen holds such status and the deportation officer is unsure of its legal effect on removal, he will consult with attorneys at the agency's Office of the Principal Legal Advisor ("OPLA").  (*Id.* at 105.)

As to removal to Guatemala in particular, Officer Robinson stated that Guatemala requires a removal order and documents that verify identity and country of origin, such as

---

[4] The Court notes Respondents' continued objections to Ms. Scholtz's testimony (Resp't's Closing Arg. [Doc. No. 50] at 5 n.5), which are preserved for appeal.

a passport, expired passport, birth certificate, or national identity document known as a cedula. (*Id.* at 106–07.) In his experience, removal flights to Guatemala leave from a staging area in the United States approximately four to twelve times per week. (*Id.*)

Officer Robinson testified that with regard to Walter A., his passport satisfied the requirement for an identity document. (*Id.* at 108, 117.) If the Court were to deny Walter A.' Petition and nothing impeded Walter A.'s removal, Officer Robinson stated that his removal could commence immediately. (*Id.* at 108.) However, Officer Robinson testified that he has not yet electronically verified Walter A.'s citizenship, as that process typically occurs when a noncitizen is ready for removal, and "he's not ready for removal at this time." (*Id.* at 117.) Also, Officer Robinson has not yet contacted Guatemalan officials to confirm their acceptance of Walter A., and he was unaware of whether Walter A.'s case officer had informed Guatemalan officials that Walter A. had claimed asylum. (*Id.*) Officer Robinson further could not address whether Walter A.'s post-order custody review had been undertaken because he was not Walter A.'s case officer. (*Id.*) He conceded that he was unsure of Walter A.'s case officer's plans or strategies for his removal, but testified that "once the stay of removal or any impediments to removal are—if they are clear, then we can remove him." (*Id.* at 119.) As to preparing a removal packet, submitting it to Guatemala, awaiting their response, and obtaining a flight manifest, Officer Robinson testified that depending on flight availability, the entire process would take one to two weeks. (*Id.* at 123.)

In response to inquiry from the Court, Officer Robinson confirmed that he would consult with OPLA to determine if SIJS posed an impediment to removal in order to avoid

29

any unlawful removal. (*Id.* at 124.) He could not estimate how long it would take OPLA to respond to such an inquiry or the form of their response. (*Id.*) Nor could Officer Robinson say whether SIJS would present a legal obstacle making removal not reasonably foreseeable. (*Id.*)

### (3) Jerome Johnson

Respondents' witness Jerome Johnson is the Assistant Benefits Director at the USCIS National Benefits Center. (*Id.* at 149.) Previously, he served as Section Chief in the USCIS division that adjudicated SIJS petitions. (*Id.* at 149–50.) He has received agency training on SIJS applications, employment authorization documents ("EADs"), and adjustment of status applications. (*Id.* at 150.) In his role as Section Chief in the SIJS division, he supervised supervisor-employees of the SIJS application adjudicators. (*Id.* at 151.) Prior to becoming a supervisor, he also served as an adjudicator of adjustment of status and EAD applications, but not SIJS applications. (*Id.* at 151–52.)

Mr. Johnson testified when an applicant applies for SIJS, the materials presented to the USCIS adjudicator include the applicant's completed I-360 Form for special immigrant status, identity documents, and a juvenile court order. (*Id.* at 152.) To his understanding, an approved I-360 Form changes the petitioner's classification in the USCIS system to allow an approved SIJS petitioner to apply for adjustment of status when a visa becomes available. (*Id.* at 153–54.) When a visa becomes available, Mr. Johnson testified that the SIJS beneficiary can then file a Form I-485 for adjustment of status. (*Id.* at 153, 159.) If USCIS grants the adjustment of status, the applicant becomes a green card holder. (*Id.* at 154.)

Mr. Johnson also addressed deferred action, which he described as a discretionary benefit that temporarily de-prioritizes a grantee for removal, and he testified regarding the SIJS-DA Program that USICS implemented in 2022. (*Id.* at 161.) Prior to the SIJS-DA Program, Mr. Johnson stated that deferred action for SIJS beneficiaries was considered on a case-by-case basis. (*Id.* at 161–62.)

As to the termination of a deferred action for a beneficiary under the SIJS-DA Program like Walter A., Mr. Johnson testified that if new information or evidence is received, or if law enforcement requests it, USCIS will re-review its prior determination for whether or not deferred action was appropriately granted. (*Id.* at 164.) Mr. Robinson stated that no advance notice is provided to the deferred action grantee of the review, (*id.* at 175–76), but also refuted the notion that his testimony was that "deferred action could be terminated without any reason and without notice." (*Id.* at 177.)

Mr. Johnson stated that the SIJS-DA Program provided guidance for the termination of deferred action for SIJS grantees, including consideration of derogatory information about the grantee such as criminal charges, fraud, or false identity, whether the grantee became a priority for removal, and the presence of a removal order. (*Id.* at 166.) Mr. Johnson testified that USCIS makes no determinations about removal, but "if someone is detained by ICE, that's an indication that they could be a priority for removal." (*Id.* at 167.) Conversely, if the deferred action grantee is not in custody, "that's enough for us to determine that [the person] is not someone who's being prioritized to be removed." (*Id.* at 172.)

As to the termination of Walter A.'s deferred action, Mr. Johnson testified that USCIS received an email request from ICE in February 2026 to "re-review" Walter A.'s grant of deferred action. (*Id.* at 169.) Upon re-review, Mr. Johnson testified that Walter A. "was detained at the time of his adjudication for his [SIJS petition], and he did have some criminality in his background. So weighing the factors, this would not have been a good candidate for deferred action." (*Id.* at 168; *see also id.* at 171.) As to the evidence of "criminality," Mr. Johnson noted that Walter A. had a conviction for one DUI and a charge for another DUI offense. (*Id.* at 171.) In addition, because Walter A. was detained by ICE at the time he filed his SIJS application, Mr. Johnson found the fact of his detention indicative of ICE's intention to remove him. (*Id.*) While there was no final removal order included in Walter A.'s file, USCIS adjudicators were able to verify its existence during the recent re-review process. (*Id.* at 171–72.) Mr. Johnson testified that based on the fact that Walter A. was in custody at the time he was granted deferred action, the original USCIS adjudicator should not have granted deferred action. (*Id.* at 173.) Rather, he stated that the adjudicator should have undertaken further review at the time they approved Walter A.'s SIJS application. (*Id.*) As to the ability of a deferred action grantee to contest termination, Mr. Johnson stated, based on his knowledge of USCIS policies and procedures, "[I]t's a discretionary benefit, so there's no recourse to protest a [termination] decision." (*Id.* at 174.)

As to Walter A.'s SIJS, Mr. Johnson confirmed that his SIJS has not been revoked and no revocation notice has been sent to him. (*Id.* at 180–81.)

32

### (4) Vicki Gonzalez

Vicki Gonzalez is the Site Supervisor at the St. Paul USCIS Application Support Center, operated by a contractor called Amentum. (*Id.* at 126–28.) In addition to managing a team of three to six staff, and maintaining a safe working environment, her daily duties include collecting biometrics, e.g., fingerprints, of non-citizen applicants for various USCIS programs. (*Id.* at 126–28, 141.) In performing her duties, Ms. Gonzalez testified that she follows USCIS policies, as set forth in a document titled "USCIS Application Support Center Standard Operating Procedures." (*Id.* at 130–31; Hackworthy Decl., Ex. A [Doc. No. 40] (USCIS ASC SOP).)

Ms. Gonzalez testified that on February 17, 2026, when Walter A. arrived for his scheduled biometrics appointment, the Application Support Center was very busy. (Evid. Hr'g Tr. at 135–36.) A staff member working as a lobby observer spoke with Walter A. and two ICE agents about his appointment. (*Id.* at 137.) When the lobby observer sought Ms. Gonzalez's guidance about Walter A.'s appointment, Ms. Gonzalez observed that Walter A. was in handcuffs and ankle shackles, and accompanied by two ICE officers. (*Id.* at 137.) Ms. Gonzalez testified that the ICE agents did not show her a copy of the Court's February 16, 2026 Order requiring Respondents to facilitate Walter A.'s biometrics appointment, and she was unaware if the agents had provided the Order to the lobby observer. (*Id.* at 142.) Ms. Gonzalez acknowledged that she generally understood the consequences of failing to follow a court order. (*Id.*)

Although the ICE agents offered to remove Walter A.'s wrist cuffs, Ms. Gonzalez informed them and Walter A. that pursuant to USCIS Standard Operating Procedures, staff

33

were not permitted to process biometrics appointments for persons in custody.  (*Id.*)  The policy in question provides that "USCIS does not grant requests to collect biometrics from aliens or other persons in custody at correctional institutions for immigration petitions or applications[.]"  (USCIS ASC SOP at 25.[5])  Ms. Gonzalez testified that she lacked the authority to override the policy, absent a court order.  (Evid. Hr'g Tr. at 145.)  Although Ms. Gonzalez identified the USCIS policy precluding the collection of biometrics from detainees as the reason for her refusal to collect Walter A.'s biometrics, she also believed that removing the handcuffs of a detained person in the Application Support Center would be unsafe.  (*Id.* at 140.)

## II.     DISCUSSION

### A. Jurisdiction

Because federal courts are courts of limited jurisdiction, the Court must first determine whether it has jurisdiction to entertain Walter A.'s Petition before it may address the merits of his claims.[6]  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025)

---

[5]  The Court's page citation to page 25 is to the internal pagination of the USCIS ASC SOP, which appears as page 4 in the ECF-filed document.

[6] While the Court must determine whether it possesses jurisdiction as a threshold matter, regardless of whether a party challenges it, the Court notes that Respondents do not challenge the Court's exercise of subject matter jurisdiction under 8 U.S.C. § 1252(g). Rather, they simply acknowledge that Petitioner does not challenge his final removal order, nor could he, as such challenges are exclusively reserved for the appropriate circuit court of appeals under 8 U.S.C. § 1252(a)(5). (Resp'ts' Initial Response to Pet. at 7; Resp'ts' Am. Response to Pet. & Response to Contempt Mot. at 4.)  The Court agrees. The limited question before this Court is different than questions raised before the BIA, whose final order Petitioner may appeal to the Eighth Circuit Court of Appeals.  Here, the Court considers only whether Respondents' alleged Fifth Amendment and federal statutory and regulatory violations entitle Walter A. to release during removal proceedings. *See Medina*

(citations omitted); *Ginters v. Frazier*, 614 F.3d 822, 826 (8th Cir. 2010). For the reasons below, the Court finds that it has jurisdiction over the Petition's unlawful detention claims.

A person detained by the government may file a petition for a writ of habeas corpus to challenge the legality of his confinement and, if successful, obtain his release. *See Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973). Under 28 U.S.C. § 2241, federal courts have jurisdiction to hear habeas challenges to the lawfulness of immigration-related detentions. *Zadvydas*, 533 U.S. at 687. A district court may not review a discretionary decision made by immigration authorities, but it may review immigration-related detentions to determine if they are constitutional. *Id.* at 688. As relevant here, the Fifth Amendment entitles noncitizens "to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). The habeas petitioner bears the burden of demonstrating by a preponderance of the evidence that their detention is unlawful. *Freeman v. Pullen*, 658 F. Supp. 3d 53, 58 (D. Conn. 2023); *Lallave v. Martinez*, 609 F. Supp. 3d 164, 171 (E.D.N.Y. 2022); *see also Bradin v. U.S. Probation & Pretrial Servs.*, No. 22-cv-3032-JWL, 2022 WL 1154622, at *3 (D. Kan. Apr. 19, 2022) (collecting cases discussing burden of proof in § 2241 habeas cases).

Under certain circumstances, however, Congress may modify or limit the right to habeas review. *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1143 (D. Minn. 2025)

---

*v. U.S. Dep't of Homeland Sec.*, No. 17-cv-218, 2017 WL 2954719, at *15 (W.D. Wash. Mar. 14, 2017). Again, Walter A. seeks release, not the termination of his removal proceedings, as relief.

(citations omitted); *see also Ozturk v. Trump*, 779 F. Supp. 3d 462, 482 (D. Vt. 2025) ("Congress may modify or eliminate the right to seek the writ if Congress provides 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'") (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)).   Such jurisdictional limits are found in 8 U.S.C. § 1252.

As to the Court's subject matter jurisdiction to hear particular claims, Section 1252(g) limits jurisdiction over certain claims raised by noncitizens, stating,

> [e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).   However, the Supreme Court has cautioned that the jurisdictional limits under § 1252(g) are "narrow," and apply only to the "review of cases 'arising from' decisions 'to commence proceedings, adjudicate cases, or execute removal orders.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 19 (2020).

The Supreme Court first addressed the narrow reach of § 1252(g) in *Reno v. American-Arab Anti-Discrimination Comm.* (hereinafter "*AADC*"), a case challenging the refusal of USCIS's predecessor agency, the Immigration and Naturalization Service, to grant deferred action by declining to remove a noncitizen on humanitarian grounds.  525 U.S. 471, 482–85 (1999).  The Supreme Court held that § 1252(g) prohibited attacks on such refusals because Congress had "directed" the statute "against a particular evil:

36

attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 485 n.9. The Supreme Court observed that there was "good reason" for Congress to proscribe judicial review of the Attorney General's "discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders,'" as they constituted "the initiation or prosecution of various stages in the deportation process." *Id.* at 483 (quoting § 1252(g)). But the Supreme Court rejected the notion that § 1252(g) "covers the universe of deportation claims," finding it "implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." *Id.* at 482.

The Supreme Court has since reaffirmed its narrow construction of § 1252(g), observing in *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018), that *AADC* "did not interpret [the phrase 'arising from' in § 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, [*AADC*] read the language to refer to just those three specific actions themselves." *Id.* at 294. Moreover, the majority in *Jennings* discounted the argument, proposed in Justice Thomas's concurrence, stating, "The concurrence contends that 'detention is an "action taken . . . to remove" an alien' and that therefore 'even the narrowest reading of "arising from" must cover' the claims raised by respondents. We do not follow this logic." *Id.* at 295 n.3 (quoting Thomas, J., concurring in part and concurring in judgment). The First Circuit's opinion in *Kong v. United States* is consistent with this authority, as the court stated, "Section 1252(g)'s bar on judicial review of claims arising from the government's decision

37

to execute removal orders does not preclude jurisdiction over the challenges to the legality of the detention at issue here." 62 F.4th 608 (1st Cir. 2023).

Petitioner's claims do not challenge the actions of Respondents in commencing proceedings, adjudicating cases, or executing removal orders. Instead, Walter A. contends that his continued detention violates his due process rights under the Fifth Amendment, as well as his rights under federal statutes and regulations. His claims are not tied to a decision to "commence" removal proceedings because such proceedings were commenced long ago, nor do his claims challenge the "adjudic[ation]" of his immigration proceedings, which remain pending before the BIA. Likewise, his claims do not seek review of the "execut[ion]" of his removal order.

Not only has Walter A.'s removal order not been executed, but his unlawful detention claims raise a purely legal question. In *Jama v. Immigration & Naturalization Service*, 329 F.3d 630, *aff'd* 543 U.S. 335 (2005), a noncitizen petitioned for a writ of habeas corpus, arguing that a provision of the immigration laws, 8 U.S.C. § 1231(b)(2)(E)(iv), did not permit the government to remove him to Somalia, his country of origin, without first establishing that Somalia would accept him. *Id.* at 631. In response, the government asserted that the court lacked jurisdiction over the claim under § 1252(g) because Jama challenged the execution of a removal order. *Id.* at 632. The Eighth Circuit rejected the government's argument, explaining that Jama was "not objecting to an unfavorable discretionary decision or action to execute the removal order." *Id.* Rather, he was challenging the government's construction of a statute—specifically, the government's legal conclusion that § 1231(b)(2)(E)(iv) "authorize[d] the INS to remove

38

Mr. Jama to Somalia without first establishing that Somalia will accept his return." *Id.* The court stressed that its role was not to second-guess the government's exercise of its discretion, but "to address a purely legal question of statutory construction." *Id.* Accordingly, the court found that habeas claims raising questions of law could proceed despite § 1252(g)'s jurisdictional limitations. *Id.* Similar to *Jama*, Walter A.'s detention rests on Respondents' construction of a statutory scheme, leading Respondents to conclude that his removal is likely in the reasonably foreseeable future.

By contrast, in *Silva v. United States*, 866 F.3d 938, the Eighth Circuit considered the scope of section 1252(g), distinguishing *Jama*. *Silva* involved a noncitizen whom the government had wrongfully removed to Mexico despite the stay of his removal order. *Id.* at 939. After immigration agents realized their mistake, they returned him to the United States, and his application for cancellation of removal was granted. *Id.* Silva subsequently sued the government under the Federal Tort Claims Act ("FTCA") for compensation for the harm caused by his unlawful removal. *Id.* The government moved to dismiss for lack of subject matter jurisdiction under § 1252(g), and the district court granted the government's motion and dismissed Silva's FTCA claims. *Id.*

On appeal, the Eighth Circuit affirmed. *Id.* at 942. It found that although the execution of Silva's removal order violated a stay, his claims were nonetheless directly related to the execution of the removal order, over which the court lacked jurisdiction under §1252(g). *Id.* at 940. Silva argued that even if his claims arose from a decision to execute a removal order, the Supreme Court's decision in *AADC* narrowed the scope of § 1252(g) only to *discretionary* decisions of the government to execute orders of removal. *Id.* He

39

contended that because the government had no discretion to ignore the stay of removal while his administrative appeal was pending, § 1252(g) did not bar his claims. *Id.*

The Eighth Circuit disagreed, finding that § 1252(g) "makes no distinction between discretionary and nondiscretionary decisions." *Id.* The court explained that the Supreme Court's "reference to discretionary decisions [in *AADC*] did not say that § 1252(g) applies *only* to discretionary decisions," observing that the statute's plain language included no such limitation. *Id.* at 941. The court held that even though the execution of Silva's removal order happened to be in violation of a stay, "[a] claim that is 'connected directly and immediately' to a decision to execute a removal order arises from that decision." *Id.* at 940 (citing *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 939, 943 (5th Cir. 1999)).

> In reaching its decision, the Eighth Circuit distinguished *Jama* stating,
>
> *Jama* did contrast a "purely legal question" with a "discretionary decision or action," but the court did not hold that § 1252(g) applies only to claims arising from discretionary decisions. The court essentially carved out an exception to § 1252(g) for a habeas claim raising a pure question of law, in part due to concerns that a contrary rule would give rise to substantial constitutional questions.

*Id.* at 941.

Like *Jama*, Walter A.'s unlawful detention claims raise a purely legal question—whether his SIJS renders him unlikely to be removed in the reasonably foreseeable future. Therefore, *Jama*'s jurisdiction exception to § 1252(g) applies to these claims. Unlike *Silva*, a lawsuit for damages that were "connected directly and immediately to a decision to execute a removal order," albeit a mistaken removal, *id.* at 940, Walter A. has not been removed, nor will ICE be removing him in the reasonably foreseeable future, as the Court

discusses *infra* at II.C.  Accordingly, for all of these reasons, the Court finds that § 1252(g) does not divest the Court of subject matter jurisdiction.

### B. *Zadvydas* and Detention During the Removal Period

Because Walter A. is a noncitizen who is subject to a final order of removal, 8 U.S.C. § 1231 governs his detention.  After an order of removal becomes final, there is a 90-day removal period during which the government "shall" remove the noncitizen.  8 U.S.C. § 1231(a)(1).  During the initial 90-day removal period, "aliens *must* be held in custody." *Zadvydas*, 533 U.S. at 683.  After this 90-day period of mandatory detention, a noncitizen "ordered removed . . . as inadmissible under section 1182 of this title . . . may be detained beyond the removal period" or "released" subject to terms of supervision.  8 U.S.C. § 1231(a)(6); *Zadvydas*, 533 U.S. at 683.

In *Zadvydas*, the United States Supreme Court decided whether the statute applicable to the extended period of removal, § 1231(a)(6), "authorize[d] the Attorney General to detain a removable [noncitizen] indefinitely beyond the removal period or only for a period reasonably necessary to secure the [noncitizen's] removal."  533 U.S. at 682.  The Court read an implicit limitation into the statute because of "serious constitutional concerns" under the Due Process Clause that would be raised by permitting indefinite detention of a noncitizen. *Id.*  The Court found that "nothing in the history of these statutes . . . clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention." *Id.* at 699.

Noting that federal courts are authorized to determine whether the extended period of removal detention is consistent with statutory authority, the Court directed lower courts

41

to consider whether a noncitizen's "particular circumstances amount[] to detention within, or beyond, a period reasonably necessary to secure removal," and to "measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the [noncitizen's] presence at the moment of removal." *Id.* at 699–700. Therefore, the Court concluded that, once removal is no longer reasonably foreseeable, continued detention is unreasonable and no longer authorized by statute. *Id.* To "guide" lower court determinations about the reasonableness of detention and to "limit the occasions when courts will need to make them," the Supreme Court held that six months was a presumptively reasonable period of detention.[7] *Id.* at 701.

---

[7] While the Supreme Court found the six-month period to be presumptively reasonable, *Zadvydas*, 533 U.S. at 701, it did not hold that a six-month removal period was conclusively reasonable in all circumstances. As noted earlier, Walter A.'s removal order became administratively final on November 13, 2025 (Robinson Decl. ¶ 29), and his detention currently falls within the extended removal period. However, Respondents do not challenge Petitioner's Petition as premature. In any event, as Petitioner notes, *Zadvydas* "articulated a rebuttable evidentiary presumption designed to limit indefinite detention and limit the times in which a Court would be required to distinguish what is reasonable, not to authorize detention where removal is legally constrained from the outset." (Pet'r's Closing Arg. [Doc. No. 49] at 9.) As the Court discusses *infra* at II.C, SIJS statutory and regulatory authority preclude Petitioner's removal without multiple procedural due process protections, rendering his removal significantly unlikely in the reasonably foreseeable future.

In addition to these unique circumstances, the Supreme Court has clarified that

> *Zadvydas* did not hold that [§ 1231(a)(6)] authorizes detention until it approaches constitutional limits; it held that, since interpreting the statute to authorize indefinite detention (one plausible reading) would approach constitutional limits, the statute should be read (in line with the other plausible reading) to authorize detention only for a period consistent with the purpose of effectuating removal.

42

### C. Likelihood of Petitioner's Removal in the Reasonably Foreseeable Future

Under *Zadvydas*, "[I]f removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." 533 U.S. at 699–700; *see also* 8 C.F.R. § 241.13(g)-(h) (stating that when ICE detains a noncitizen pursuant to a final order of removal, it is required to release the noncitizen subject to appropriate conditions if there is no significant likelihood of removal in the reasonably foreseeable future).

Respondents argue that no legal authority supports the position that SIJS precludes Walter A.'s removal (Resp'ts' Closing Arg. [Doc. No. 50] at 5), but the question before the Court is narrower—whether, consistent with *Zadvydas*, 533 U.S. at 699–700, Walter A.'s removal is significantly likely in the reasonably foreseeable future given his status as

---

*Clark v. Martinez*, 543 U.S. 371, 384 (2005). Moreover, other district courts have found that *Zadvydas* does not preclude a petitioner from challenging his or her immigration detention prior to the six-month mark. *See, e.g., Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 395–98 (D. N.J. 2025) (holding that while the presumption of reasonableness "is the default" during the six-month period, if a petitioner claims and proves that his removal is not reasonably foreseeable during that period, he can overcome the presumption); *Cruz Medina v. Noem*, No. 794 F. Supp. 3d 365, 376 (D. Md. 2025) ("*During* the six-month period, the burdens of production and persuasion remain with the petitioner. By delaying the burden shift until after the six-month period expires, the Supreme Court "limit[ed] the occasions"—but, crucially, did not *eliminate* the occasions—when courts will need to make the ultimate determination of whether a petitioner is reasonably likely to be removed in the foreseeable future."); *Ali v. Dep't of Homeland Sec.*, 451 F. Supp. 3d 703, 706–07 (S.D. Tex. 2020) ("Whereas the *Zadvydas* Court established a presumption that detention that exceeded six months would be unconstitutional, it did not require a detainee to remain in detention for six months or to prove that the detention was of an indefinite duration before a habeas court could find that the detention is unconstitutional.").

43

a Special Immigrant Juvenile. Resolution of that question requires consideration of the unique status of SIJS beneficiaries and their attendant due process rights.

### 1. Unique Status of SIJS Beneficiaries

SIJS "reflects the determination of Congress to accord . . . abused, neglected, and abandoned children a legal relationship with the United States and to ensure they are not stripped of the opportunity to retain and deepen that relationship without due process." *Osorio-Martinez*, 893 F.3d at 170. The SIJS statutory scheme protects Special Immigrant Juveniles from removal by exempting them from various grounds of inadmissibility, and provides a pathway to LPR status.

Here, although Walter A. is subject to a final order of removal that charges him with entering the country without admission or parole, as a Special Immigrant Juvenile, he has been "deemed, for purposes of [adjustment of status] to have been paroled into the United States" at the time of entry into the country.[8] 8 U.S.C. § 1255(h)(1). Using the retroactive tense, Congress did not delay parole into the United States for SIJS beneficiaries *until* they are eligible to apply for adjustment of status. Instead, it treated SIJS beneficiaries, for the purpose of adjustment of status, "as if they had been lawfully paroled into the country *upon*

---

[8] Although Respondents do not raise this argument in their briefs, to the extent they suggest that the language regarding parole is strictly limited to the adjustment of status and does not refer to removability, (*see* Evid. Hr'g Tr. at 77–79), they cite no case law in support of the position. As one court reasoned when it rejected this argument, "[T]he limited scope [respondents] attribute to Section 1255(h)'s waiver of inadmissibility is difficult to reconcile with 8 U.S.C. § 1182(a)(6)(A)(i), which excludes without qualification from the category of aliens deemed inadmissible, aliens, such as [petitioner], who have been paroled into the United States." *Sarmiento v. Perry*, --- F. Supp. 3d ---, No. 1:25-CV-01644-AJT-WBP, 2026 WL 131917, at *6 (E.D. Va. Jan. 19, 2026).

*entry* or, at the latest, upon approval of the SIJS petition." (Scholtz Report ¶ 44) (emphasis added). In addition, Congress exempted SIJS beneficiaries from generally applicable grounds of inadmissibility, including inadmissibility based on a lack of "valid entry document[s]." 8 U.S.C. §§ 1255(h)(2), 1182(a)(7)(A)(i)(I).

While Respondents argue that SIJS does not change Walter A.'s legal status, the Third Circuit expressly rejected this argument in *Osorio-Martinez*, stating that it was "belied by the text of the INA, which explicitly designates SIJ as a 'status' that affords its designees a host of legal rights and protections." 893 F.3d at 161 n.7 (citing 8 U.S.C. § 1101(a)(27)(J)(iii) (describing SIJ as a "status"); 8 C.F.R. § 204.11(b) (same); 8 U.S.C. § 1255(h) (listing rights); *see also Yeboah*, 345 F.3d at 221 (describing SIJS as a "special status to remain in the United States"). In light of these rights and protections, Congress provided "opportunities for this class of [noncitizens] to strengthen their connections to the United States, pending a determination on their applications for adjustment of status." *Osorio-Martinez*, 893 F.3d at 170.

The statutory language and history of the SIJS statutory scheme demonstrates Congress's clear intent that Special Immigrant Juveniles are to remain in the United States pending their application for adjustment of status. *See* 8 U.S.C. § 1101(a)(27)(J) (defining a Special Immigrant Juvenile as "an immigrant who is present in the United States—"); *Yeboah*, 345 F.3d at 221 (noting that under the SIJ provisions of the INA, abused, neglected, or abandoned children "may seek special status to remain in the United States.") This intent is reflected in the legislation's purpose of providing relief for vulnerable, foreign-born juveniles living in the United States who have been abused, neglected,

45

abandoned, or similarly mistreated by a parent, and for whom a state court has found that it would not be in their best interest to be returned to their country of origin. *See* 8 U.S.C. § 1101(a)(27)(J); *Yeboah*, 345 F.3d at 221. Moreover, this intent is further reflected in the waivers of removability for SIJS beneficiaries, the removal of barriers to adjustment of status, SIJS beneficiaries' exemption from certain grounds of inadmissibility, and legislative language. The title of the TVPRA section addressing SIJS protections, "Permanent Protection for Certain At-Risk Children," Pub. L. No. 110-457, sec. 235(d), 122 Stat. at 5079, underscores Congress's intent to confer permanent protection from removal on SIJ beneficiaries. (Scholtz Report ¶ 40) (citing *Yates v. United States*, 574 U.S. 538, 540 (2015) (recognizing that although statutory "headings are not commanding, they supply cues" about congressional intent)).[9]

In addition, the "requirements for SIJ status 'show a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status'" pursuant to 8 U.S.C. § 1153(b)(4). *Osorio-Martinez*, 893 F.3d at 168 (quoting *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011)). In order to obtain SIJS, a Scott

---

[9] Other statutes reflect Congress's intent that SIJS beneficiaries remain safe and present in the United States. (Scholtz Report ¶ 45.) For instance, an SIJS petitioner "who has been battered, abused, neglected, or abandoned" cannot "be compelled to contact the alleged abuser (or family member of the alleged abuser) at any stage of applying for [SIJS]." 8 U.S.C. § 1357(h). "Congress cannot have meant to protect juveniles from harmful contact with abusive or neglectful parents during the SIJS application process only to allow the Government to remove these same children after *granting* SIJS, placing them again at risk of dependency on unfit parents and loss of the stability available to them in the United States." (Scholtz Report ¶ 45) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations with the legislative purpose are available.")).

County district judge found that it was not in Walter A.'s best interest to return to Guatemala, and that it was in his best interest to "*remain[] in the United States* with [his guardian]." (Order for Guardianship of At-Risk Juvenile at 3) (emphasis added). What's more, USCIS endorsed these findings by approving and exercising their statutory consent to Walter A.'s SIJS application. Given this endorsement, it is perverse that "the very federal Department that here attempts to remove Walter earlier acknowledged that he had shown a *bona fide* need to avoid re-exposure to parental abuse, neglect, and abandonment, and that it would not be in his best interest to return to Guatemala." (Scholtz Report ¶ 43.) As the Third Circuit noted, under the rigorous statutory scheme that requires the approval of both state and federal authorities, a successful applicant is essentially "a ward of the United States." *Osorio-Martinez*, 893 F.3d at 168. Moreover, "the predicate state juvenile court proceeding necessitate[s] substantial connections with a U.S. community and guardian," (Scholtz Report ¶ 57), as does the eligibility requirement that the juvenile remain physically present in the United States during the SIJS petition and approval processes. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(b)(3).

The Court finds that the SIJS statutory protections, including the adjustment pathway to LPR status, parole for adjustment of status purposes, exemptions from inadmissibility, prior visa backlog protections based on deferred action, and safeguards preventing Special Immigrant Juveniles from being forced to contact their abusers demonstrate that SIJS beneficiaries are to remain in the United States until they are able to obtain adjudication on their adjustment of status applications. Based on the SIJS statutory scheme, other courts have reached the same conclusion. *See, e.g., Joshua M. v. Barr*, 439

47

F. Supp. 3d 632, 649 (E.D. Va. 2020) (finding that SIJS confers "significant benefits for young immigrants and certain protections against removal," including eligibility to obtain LPR status and eventually apply for citizenship); *Garcia Lanza v. Noem*, --- F. Supp. 3d ---, No. 26-0029, 2026 WL 585130, at *5 (E.D.N.Y. Mar. 3, 2026) (finding that SIJS beneficiaries have the right to live and work in the United States pending further processes); *Xol-Maas v. Francis*, No. 26-CV-00025 (JAV), 2026 WL 457005, at *8 (S.D.N.Y. Feb. 18, 2026) ("Congress clearly contemplated that SIJ designees would remain in the United States while awaiting adjudication of their adjustment of status applications."); *Sarmiento v. Perry*, --- F. Supp. 3d ---, No. 1:25-cv-01644, 2026 WL 131917, at *1 (E.D. Va. Jan. 19, 2026) (finding SIJS conferred upon petitioner "the status of a parolee with inadmissibility waived as a ground for his detention or removal within the context of his challenges to his detention.").

### 2. Due Process Rights

As the Supreme Court observed in *Zadvydas*, "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." 533 U.S. at 693. "The protections afforded to children with SIJ status include an array of statutory and regulatory rights and safeguards, such as eligibility for application of adjustment of status to that of lawful permanent residents (LPR), exemption from various grounds of inadmissibility, and robust procedural protections to ensure their status is not revoked without good cause." *Osorio-Martinez*, 893 F.3d at 158. These procedural protections include "at least minimal due process rights." *Id.* at 173.

48

Here, Walter A.'s status as a Special Immigrant Juvenile confers "a host of procedural rights designed to sustain [his] relationship to the United States and to ensure [he] w[ill] not be stripped of SIJ protections without due process." *Id.* at 171. "SIJS beneficiaries are a "hair's breadth from being able to adjust their status, pending only the availability of immigrant visas and the approval of the Attorney General," and "[t]his proximity to LPR status is significant because the lawful permanent resident is the quintessential example of a[] [noncitizen] entitled to 'broad constitutional protections.'" *Id.* at 174. Because of the demanding standards to obtain SIJS and the substantial protections accorded to SIJS beneficiaries under the law, Special Immigrant Juveniles are entitled to due process. *See, e.g., Campos-Flores v. Bondi*, No. 25-cv-797, 2025 WL 3461551, at *6 (E.D. Va. Dec. 2, 2025) (finding petitioner with SIJS was entitled to due process protections under the Fifth Amendment and a bond hearing before an immigration judge); *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 918–19 (E.D. Va. 2024) (same); *J.L. v. Cissna*, 374 F. Supp. 3d 855, 868–69 (N.D. Cal. 2019) (finding SIJS petitioners had plausibly alleged a protected property interest in their status that was protected by the due process clause); (*see also* Scholtz Report ¶ 56).

In habeas actions involving SIJS beneficiaries, federal district courts have found that SIJS beneficiaries who have not had the opportunity to adjust status cannot be lawfully removed. *See, e.g., Xol-Maas*, 2026 WL 457005, at *9 ("To be clear, an SIJ designee is not legally entitled to adjust status, as that is a discretionary determination which lies with the executive branch," but "Petitioner does, however, have due process rights in being afforded an opportunity to have his adjustment of status application adjudicated.");

49

*Sarmiento*, 2026 WL 131917, at \*6 (granting preliminary injunctive relief and ordering immediate release of petitioner with approved SIJS based on due process, and noting that "SIJ status operates to confer upon him the status of a parolee with inadmissibility waived as a ground for his detention or removal within the context of his challenges to his detention."); *Del Cid v. Bondi*, No. 25-00304, 2025 WL 2985150, at \*4 (W.D. Pa. Oct. 23, 2025) ("Two legal principles emerge relevant to individuals with SIJ Status.  First, the Government must provide them an opportunity to pursue adjustment of status, and the way in which the Government seeks to remove them must adequately take stock of their SIJ Status.  Second, the Government may ultimately remove an individual with SIJ Status from the country, so long as it complies with the first principle.") (citations omitted).

Due process is particularly important in this context, as the court in *Sarmiento* observed, "[I]t is 'peculiar' at the very least 'that DHS grants [a petitioner] relief pursuant to the SIJ statutes while another agency within DHS, Immigration and Customs Enforcement, simultaneously pursues removal,' since 'the removal process may inherently jettison his SIJ status for lack of presence in the United States.'"  2026 WL 131917, at \*6 (quoting *Joshua M.*, 439 F. Supp. 3d at 676–80); *see also Alfaro Herrera v. Baltazar*, No. 1:25-CV-04014-CNS, 2026 WL 91470, at \*13 (D. Colo. Jan. 13, 2026) (noting conflict between ICE's pursuit of removal and USCIS's award of SIJS, stating, "[I]n light of the extensive procedural safeguards granted to SIJ beneficiaries, it is impossible to reconcile the discrepancy between ICE and USCIS's actions[.]").

Respondents' position on the likelihood of Walter A.'s removal in the reasonably foreseeable future is based on logistical steps for removal, such as Walter A.'s possession

of a Guatemalan passport and the availability of flights to Guatemala. (*See, e.g.*, Evid. Hr'g at 108, 117–19.) Even so, however, Deportation Officer Robinson testified that ICE has not set a specific removal date or prepared removal documentation. (*Id.* at 107, 116–17.) Nor has ICE verified Walter A.'s citizenship with the government of Guatemala or confirmed that Guatemala's acceptance of him.[10] (*Id.*) Nor can Officer Robinson say whether SIJS would present a legal obstacle making removal not reasonably foreseeable. (*Id.* at 124.)

Setting aside the time needed to coordinate the necessary mechanics of removal, Walter's unrevoked SIJS presents a constitutional barrier that renders his removal unlikely in the reasonably foreseeable future. His due process rights are vested in his SIJS, regardless of the presence or absence of deferred action. As a Special Immigrant Juvenile, Walter A.'s removal would be based on a ground for inadmissibility—being present in the United States without admission or parole, *see* 8 U.S.C. § 1182(a)(6)(A)—from which he is legally exempted by virtue of his SIJS. *See* 8 U.S.C. § 1255(h)(2)(A) (waiving 8 U.S.C. § 1182(a)(6)(A)); *see also Xol-Maas*, 2026 WL at *8 ("The fact that Petitioner's removal is predicated on a ground that the statute explicitly waives for SIJs, his inadmissibility,

---

[10] In addition to affording constitutional due process to detainees, "[a]gencies must follow their own regulations." *Saengnakhone S. v. Noem*, No. 25-cv-4775 (ECT/LIB), 2026 WL 34132, at *3 (D. Minn. Jan. 6, 2026) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954); *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1998)). When ICE detains a noncitizen pursuant to a final order of removal, it is required to release the noncitizen on an order of supervision if there is no significant likelihood of removal in the reasonably foreseeable future. 8 C.F.R. § 241.13(g)-(h). Deportation Officer Robinson was unaware of ICE performing any custody review or determination of Walter A.'s reasonable foreseeability of removal (Evid. Hr'g Tr. at 118–19), as required by regulation. 8 C.F.R. § 241.4(k)(1)(i).

highlights the tension between Congressional intent and the executive branch's actions.").

Once removed, Walter A. would be unable to adjust his status, as the plain language of the SIJS statute requires his physical presence in the United States, 8 U.S.C. § 1101(a)(27)(J), and "[n]o guarantees exist that [he] could preserve or revive his SIJ status should he be removed from the United States." *Joshua M.*, 439 F. Supp. 3d at 675. In short, Walter A.'s removal while possessing valid, unrevoked SIJS "would render SIJ status a nullity." *See Osorio-Martinez*, 893 F.3d at 172.

While SIJS confers unique status and attendant due process protections upon recipients, revocation is possible, subject to procedural due process.[11] Only USCIS may revoke SIJS—not ICE—and only upon on a showing of "good and sufficient cause." 8 U.S.C. § 1155; 8 C.F.R. § 205.2(a). As Walter A. notes, if ICE removes him, it will undertake an unlawful de facto revocation of his SIJS, as that revocation can only be undertaken by USCIS. *See* 8 C.F.R. § 204.11(j). USCIS has identified examples of "good and sufficient cause" as fraud or if USCIS determines that SIJS petition was approved in error. USCIS Policy Manual Vol. 6, Pt. J, Ch. 4F(3), https://www.uscis.gov/policy-manual/volume-6-part-j (last accessed Mar. 22, 2026). Moreover, except in rare circumstances, revocation may proceed "only on notice to the petitioner," who "must be

---

[11] While there is no indication that the facts support it here, SIJS may be automatically revoked prior to final adjustment to LPR status if either of the following occurs: (1) reunification of the SIJS beneficiary with one or both parents pursuant to a juvenile court order, where the court previously found reunification not viable due to abuse, neglect, or abandonment; or (2) "[a]dministrative or judicial proceedings determine that it is in the [SIJ] beneficiary's best interest to be returned to the country of nationality or last habitual residence of the [SIJ] beneficiary or of their parents." 8 C.F.R. § 204.11(j)(1)

given the opportunity to offer evidence in support of the petition . . . and in opposition to the grounds alleged for revocation. . . ."  8 C.F.R. §§ 205.2(b), 204.11(j).  USCIS must provide a written explanation for any revocation.  *Id.* § 205.2(c).

USCIS has not revoked Walter A.'s SIJS, nor has it provided any notice of revocation.  (Evid. Hr'g Tr. at 180–81.)  Respondents have not identified any bases for revocation in this action.  Given that these significant procedural steps have not occurred, if USCIS seeks to revoke Walter A.'s SIJS, they are not likely to do so in the reasonably foreseeable future.  Again, only USCIS may revoke the SIJ status that it conferred.  Because USCIS is unlikely to revoke Walter A.'s SIJS in the reasonably foreseeable future, the Court finds that his detention is unconstitutional.  He is entitled to immediate release on this basis.

### D. Deferred Action and Deferred Action Rescission Motion

In addition to his SIJS, Walter A. argues that his deferred action, which was revoked during the pendency of this habeas action, also precludes his removal in the reasonably foreseeable future, and supports his release from detention.  (Pet. ¶¶ 50–57.)  Indeed, a number of district courts have granted habeas petitions for SIJS beneficiaries with deferred action, finding their detention unconstitutional because they are not removable in the reasonably foreseeable future.  *See, e.g.*, *Forsah R-Z v. Noem*, No. 1:26-CV-00828-DJC-AC, 2026 WL 310069 (E.D. Cal. Feb. 5, 2026) (granting habeas petition of SIJS beneficiary with deferred action and final removal order); *Guerra Leon v. Noem*, No. 3:25-01495 SEC P, 2025 WL 4113562, at *3–4 (W.D. La. Oct. 30, 2025) (same); *Primero v.*

*Mattivelo*, No. 1:25- CV-11442-IT, 2025 WL 1899115, at *5 (D. Mass. July 9, 2025) (same).

USCIS revoked Walter A.'s deferred action on February 19, 2026. (Resp'ts' Closing Arg. at 6.) Walter A. argues that the revocation was retaliatory—the notice of revocation arrived one day after he filed his Contempt Motion—and he seeks injunctive relief requiring USCIS to reinstate his deferred action and invalidate its termination. (Pet'r's DA Rescission Mot. at 2.)

Deferred action is a discretionary form of relief. *See Domingo M.M. v. Shea*, No. 25-cv-2830 (LMP/ECW) (D. Minn. Aug. 1, 2025) [Doc. No. 24]. It is "an act of administrative convenience to the government that gives some cases lower priority" for removal, *see* 8 C.F.R. § 274a.12(c)(14), and does not provide a direct pathway to LPR status. Unlike revocation of SIJS, for which procedural due process is required by statute and regulation, 8 U.S.C. § 1155; 8 C.F.R. § 205.2(a), the revocation of deferred action is discretionary. (Evid. Hr'g Tr. at 174.) Mr. Johnson testified that Walter A.'s deferred action was re-reviewed pursuant to a request from a law enforcement agency, and the reviewer determined that Walter A. would not have been a good candidate for deferred action in the first instance, as he was detained at the time his petition was adjudicated—and indication that ICE intended to remove him—and he had a DUI conviction. (*Id.* at 168, 171.)

Granted, the timing of USCIS's termination is suspicious, and the bases that Mr. Johnson identified for termination were facts in existence at the time USCIS approved Walter A.'s application for deferred action. (*See id.* at 186–87.) However, under

54

*Zadvydas*, a district court may not review a discretionary decision made by immigration authorities. 533 U.S. at 687. Given the discretionary nature of an award or termination of deferred action, the Court lacks the authority to require USCIS to reinstate Walter A.'s deferred action. Accordingly, his Deferred Action Rescission Motion is denied.

### E. Habeas Claims Related to Biometrics Policies and T Visa and U Visa Applications

In addition to Walter A.'s unlawful detention claims regarding the likelihood of his removal in the reasonably foreseeable future, he also asserts claims under 5 U.S.C. § 706(2)(c), 5 U.S.C. § 553, and the Fifth Amendment challenging USCIS's biometrics policies and the processing of his T Visa and U Visa applications. (Pet. ¶¶ 138–47.) He argues that USCIS simultaneously requires biometrics for adjudication of these visa applications, but categorically excludes persons in custody from attending biometrics appointments. (*Id.*)

Again, an immigration detainee may petition for a writ of habeas corpus to challenge the legality of his confinement under the Constitution or laws and treaties of the United States. 28 U.S.C. § 2241. Because Walter A.'s claims related to biometrics policies do not challenge the legality of his confinement, the Court finds that relief is unavailing in a habeas action. Accordingly, the Court denies relief on Petitioner's biometrics claims.

### F. Contempt Motion

Also before the Court is Walter A.'s Contempt Motion. As noted earlier, USCIS violated the Court's February 16, 2026 Order by not conducting Walter A.'s February 17, 2026 biometrics appointment. Ironically, the Court's Order requiring ICE to transport

Walter A. to his appointment came at the suggestion of Respondents' counsel as an alternative to release, (Resp'ts' Initial Response to Pet. at 16), yet his client, USCIS, refused to conduct the in-person processing.

From the testimony of Ms. Gonzalez, site supervisor at the USCIS Application Support Center, it appears that the refusal was made pursuant to USCIS policy, (USCIS ASC SOP at 25), out of safety concerns, and in ignorance of the Court's Order, rather than in defiance of it. (Evid. Hr'g Tr. at 140, 142.) Respondents also provided assurances that Walter A.'s fingerprints were sent and received by USCIS in support of his visa applications. (Warren Decl. ¶¶ 8–9.) Therefore, it appears that the potential harm has been remedied. Accordingly, the Court declines to sanction Respondents and denies the Contempt Motion as moot.

### III. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Petitioner Walter A.'s Petition for Writ of Habeas Corpus is **GRANTED in part** as to his claims regarding unlawful detention and his request for release; and **DENIED in part** as to his claims regarding biometrics and his T Visa and U Visa applications. As to his release:

    a. Respondents are **ORDERED** to immediately release Walter A. from custody by no later than March 27th, 2026.

    b. Prior to Petitioner's release, Respondents must first notify Petitioner's legal counsel, Stacy Rogers (320-345-5945; stacey@srrlawgroup.com) or Hannah Brown (612-439-1882; hannah@hblawadvocacy.com), within two hours of his impending release, and include the location of his release and approximate release time, so that Petitioner's counsel may make

transportation arrangements and Petitioner's counsel may notify family members.

c. Upon release, Respondents shall return to Petitioner all of his identifying documents, immigration documents, paperwork of any kind, his cell phone, and any other personal belongings, including clothing and jewelry.

d. Respondents may not administratively recharacterize the release granted by this Order as grounds to impose conditions or re-impose existing conditions in conjunction with release (including release on recognizance or similar instruments), without prior notice to and authorization from the Court, or absent a new and independently lawful custody decision properly executed under the law.

e. No later than March 30, 2026, Respondents are **ORDERED** to provide notice on CM/ECF confirming that Walter A. was released from custody consistent with this Order.

2. Petitioner's Emergency Motion to Hold in Contempt and Order Immediate Release Motion for a Temporary Restraining Order ("Contempt Motion") [Doc. No. 16] is **DENIED AS MOOT**.

3. Petitioner's Motion for TRO and Preliminary Injunction [Doc. No. 22] ("Deferred Action Rescission Motion") is **DENIED**.

Dated: March 26, 2026                      s/Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge

57